UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHARYL MARDEN,

        Plaintiff,

v.

COUNTY OF MIDLAND, et al.,

        Defendants.

Case No. 15-cv-14504

Honorable Thomas L. Ludington

_____/

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
AND DENYING AS MOOT DEFENDANTS' MOTION CHALLENGING EXPERT AND
MOTION TO STRIKE NEWLY ADDED EXPERTS**

This case arises out of the tragic death of Jack Brian Marden while in the custody of Defendant Midland County on February 13, 2015.  On December 31, 2015, Jack Marden's wife, Plaintiff Sharyl Marden, filed her complaint against Midland County and Captain Richard Harnois (the "County Defendants"), and Midland County jail employees Lieutenant Jeffrey Derocher, Deputy Brian Keidel, Deputy Richard Speich, Deputy Joshua Michael Saylor, and Deputy Bryan Kryzanowicz (together the "Officer Defendants").  *See* Compl., ECF No. 1. Plaintiff asserts that Jack Marden's death resulted from the individual Defendants' violations of the Fourth, Eighth, and Fourteenth Amendments pursuant to 42 U.S.C. § 1983, and that Defendant Midland County is liable for those actions pursuant to *Monell v. Department of Social Services of New York,* 436 U.S. 658 (1978).  She also asserts that the actions of the Officer Defendants constitute state law assault and battery.

On January 3, 2017 Defendants filed a motion to challenge the revised opinion of their own expert, Doctor Kanu Virani, M.D.  *See* ECF No. 44.  On January 19, 2017, the Midland County Defendants and the Officer Defendants filed motions for summary judgment. *See* ECF

Nos. 49, 51. Finally, on February 10, 2017, Defendants moved to strike Plaintiff's newly added expert witnesses. *See* ECF No. 63. For the reasons stated below, Defendants' motions for summary judgment will be granted. Their motions to challenge Dr. Verani's revised opinion testimony and to strike newly added experts will be denied as moot.

## I.

Plaintiff Sharyl Marden is a resident of Midland County, Michigan. She is the duly appointed personal representative of the estate of her husband, Decedent Jack Brian Marden. Jack Marden, born on January 29, 1959, had no history of violence but had been diagnosed with depression. He was 5'11" and weighed 205 pounds.

Defendant County of Midland is a governmental entity organized and existing under the laws of the State of Michigan. Midland County is responsible for operating the Midland County Sheriff's Department and the Midland County Jail. *Id*. At all relevant times Defendant Harnois was employed by Midland County as Captain for the Midland County Sheriff's Department and Jail Administrator for the Midland County Jail. Officer Derocher was employed as a lieutenant, and all other Officer Defendants were employed as deputies. Plaintiff alleges that the individual Defendants were acting in their individual capacities within the course and scope of their employment at the time of the relevant events.

## A.

On January 19, 2015, officers from the Midland Police Department were called to the Marden's residence for a domestic dispute. At the scene, a police officer deployed a Tazer to subdue Jack Marden, who was then transported by ambulance to MidMichigan Medical Center for a psychiatric evaluation without incident. In the call for the ambulance, it was represented that Marden had an injury to his arm in the form of a laceration and was the subject of

"overdose/poisoning." Plaintiff alleges that the incident took place after Jack Marden overdosed on Valium.

After being observed at MidMichigan Medical Center overnight, Marden was discharged. The discharging physician noted that Jack Marden was suffering from major depression, but that he denied feeling helpless or suicidal. At the time, decedent was agreeable to continuing care and counseling, and agreed to referral to out-patient services for therapy for himself and Plaintiff, his wife. The discharging physician opined that Jack Marden did not present an imminent danger to himself or others.

Marden returned home following his discharge, where he remained until February 4, 2015.  On that date, the Midland City Police Department acted on a felony arrest warrant charging Jack Marden with assault and aggravated assault as a result of the domestic incident that took place on January 19, 2015.  He was then taken to the Midland County jail, where he was held in the intake area of the jail as a pretrial detainee until February 11, 2015.

**B.**

The events preceding Defendants' efforts to physically control Plaintiff are largely undisputed.  After being observed with deteriorating mental health, on February 11, 2015 at around 11:19 AM, Jack Marden was removed from his cell for an interview with Community Mental Health supervisor, Gina Latty, and a representative of Community Mental Health, Marissa Boulton. [1] *See* Latty Dep. 11-12, ECF No. 64-28. At the time of the interview Nurse Latty did not know anything about Marden's medical history. *Id*.  She testified that she was

---

[1] Plaintiff alleges that Jack Marden's erratic behavior was the result of Valium withdrawal, and that the incident could have been avoided if the jail had provided Marden with his normal Valium prescription.  However, Plaintiff's § 1983 claim and assault and battery claims focus solely on Defendants' alleged misuse of force in responding to Jack Marden's behavior on February 11, 2015. *See* Compl. pp. 12-16.  Plaintiff elected not to add the jail healthcare providers to the action, and contested Defendants' attempt to file a third-party complaint seeking contractual indemnity from the medical providers. Therefore, any actions of the jail medical providers during the time between Marden's intake and the events that took place on February 11, 2015 are irrelevant based on the framing of Plaintiff's complaint. *See* ECF No. 33.

unable to obtain a signed medical release or any information from Marden due to his psychotic state, and that he accused her of trying to kill him and claimed that he was pregnant. *Id*. at 18-20. Ms. Boulton therefore left to advise Lieutenant Derocher that Marden was becoming agitated, and requested that he be returned to his cell.

A video camera located in Jack Marden's cell captured the events that followed. When Lieutenant Derocher, Deputy Saylor and Deputy Speich walked Jack Marden back to his cell, Marden initially entered the cell, but then exited and sat down on the ground. After a brief discussion, the three officers attempted to guide Marden back into the cell, at which time he began physically resisting and fighting the officers. The officers then lifted Marden up and placed him in the cell. During this encounter, Marden took Lieutenant Derocher's radio from his belt and called for help. Marden was eventually subdued and placed in the cell.

As a result of this incident, Nurse Latty organized an informal debrief with Captain Harnois, Lieutenant Derocher, Ms. Boulton, and Deputy Speich. *See* Derocher Dep. 36, ECF No. 64-29. Nurse Latty then began making arrangements for Marden to be transported to the MidMichigan Medical Center's Mental Health Unit. *See* Latty Dep. 29-30. The jail employees then formulated a plan to transport Marden in a way that would minimize the risk of incident. Captain Harnois ultimately ordered members of the Corrections Emergency Response Team ("CERT") to put on protective equipment designed to protect law enforcement officers from injuries and prevent officers from inflicting unnecessary injuries upon the individual being subdued. *See* Derocher Dep. 58. Lieutenant Derocher did not put on any protective gear himself.

Back in his cell Marden continued behaving erratically. After lying on his bed mat for about nine minutes, Marden removed his jumpsuit and urinated on it. He also wiped urine and feces on his naked body and soaked his blanket in toilet water. For the next half hour Marden

alternated between lying on his mat and crouching behind a waist-high barrier that separated the bathroom portion of his cell from the bed mat.

The following events were captured not only by the cell camera, but also by a hand-held video and audio recorder operated by Captain Harnois. At approximately 12:02 p.m. the Officer Defendants entered Jack Marden's cell. Marden responded by throwing the urine-soaked blanket and jumpsuit at the officers. The Officer Defendants, including Lieutenant Derocher, restrained Marden against the wall in the bathroom portion of the cell and forced him to the ground under the sink. As Marden continued to struggle, the deputies attempted to restrain his extremities, with Derocher attempting to control his head. During the struggle, Marden grabbed Derocher's testicles. While this event is not caught on video, Derocher can be heard yelling, "Oh you fucking asshole! Fucking let go of my balls! God damn it! Let go of me. Let go of me!" In response Derocher punched Marden in the head three times until Marden released his testicles and Derocher was able to place his shin on top of Marden's arm. Marden was repeatedly advised to "stop resisting." Once Marden was confined, Nurse Laura Sasse, R.N., injected him with a shot of Haldol.

As minutes passed, Marden continued to struggle and began breathing heavily. Perceiving that the still-struggling Marden was attempting to spit on him, Lieutenant Derocher requested that Deputy Saylor retrieve a spit hood to place over Marden's face. A spit hood is a mesh polyester bag that is placed over a person's head. *See* ECF No. 49-22. Marden told Derocher to take the spit hood off of him, to which Derocher responded, "we're trying to let you breath, brother, but you've got to relax man. You gotta stop fighting us. Alright?" Marden repeatedly informed Derocher that he was having trouble breathing, to which Derocher repeatedly responded that Marden needed to relax.

- 5 -

About a minute after the spit hood was placed on Marden's face, Lieutenant Derocher requested a nurse and reported that Marden was experiencing agonal breathing. He also requested that someone quickly call 911.  After again advising Marden to relax, Lieutenant Derocher ordered the Deputies to move Marden out from under the sink. He also advised the deputies to keep Marden in a position where there was no weight on his chest. While Marden's breathing temporarily improved, Derocher expressed concern to a nurse about Marden's agonal breathing. Derocher did not to remove the spit hood due to Marden's active resistance.  Marden again stated that he could not breathe.

After Marden's breathing again worsened, a nurse advised that placing Marden in a chair would be beneficial.  The officers therefore lifted a still-struggling Marden and placed him onto a chair.  As they were strapping Marden in, an officer noted that Marden's hands were "coloring out" and turning white. Marden again asked that the spit hood be removed and requested water.

After sitting in the chair for about a minute Marden began to lose consciousness. Nurse Sasse advised the officers remove the spit hood in order to facilitate Marden's breathing in response to an inquiry from Captain Harnois.  She agreed with Captain Harnois's suggestion that the spit hood could be contributing to a sense of claustrophobia.  As the spit hood was removed – just under ten minutes after the incident began – Marden lost consciousness.  The officers therefore removed him from the chair, placed him on the ground, and began performing CPR. Marden was described as being in "full arrest."  Emergency responders quickly arrived and transported Marden to the MidMichigan Medical Center by ambulance.

Upon arrival it was determined that Marden was in acute cardiac pulmonary arrest. Marden died two days later, on February 13, 2015 at 2:30 p.m.  Plaintiff alleges that the death was proximately caused by "the needless, unnecessary, and violent assault on Jack Marden…."

Compl.  Plaintiff Sharyl Marden, as personal representative of Decedent's estate, responded by filing the present action against Defendants on December 31, 2015.

## II.

Defendants now move for summary judgment as to each of Plaintiff's claims. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The opposing party may not rest on its pleadings, nor "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (internal quotations omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson,* 477 U.S. at 251-52.  The Officer Defendants and the Midland County Defendants have each filed a motion for summary judgment.

## A.

In their motion for summary judgment, the Officer Defendants argue that qualified immunity shields them from Plaintiff's § 1983 claims. *See* Mot. Summ. J. II, ECF No. 51. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Id.* To establish a claim under § 1983 a "plaintiff must establish both that 1) []he was deprived of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).

Government officials are immune from civil liability under § 1983 "when performing discretionary duties, provided 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Whitney v. City of Milan*, 677 F.3d 292, 296 (6th Cir. 2012) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether a government official enjoys qualified immunity for a particular act, courts must apply a two-prong test: (1) "whether the facts, viewed in the light most favorable to the nonmoving party, show the officer's conduct violated a constitutional right;" and (2) "whether the constitutional right was clearly established by asking whether a reasonable official would understand that what he is doing violates that right." *Whitney*, 677 F.3d at 296 (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)).

Courts have discretion to analyze these steps in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Bypassing the constitutional question is particularly appropriate where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 237. "A right is clearly established if the contours of the right are sufficiently clear so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right." *Bailey v. Kennedy*, 349 F.3d 731, 741 (4th Cir. 2003)

(internal quotation marks and alteration omitted).  In other words, "existing precedent must have placed the statutory or constitutional question ... beyond debate." *Occupy Nashville v. Haslam*, 769 F.3d 434, 443 (6th Cir. 2014) (quoting *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014)).  Courts should not define clearly established law at a high level of generality, but must instead look to the particular circumstances that the officer faced. *See Plumhoff*, 134 S.Ct at 2023.

### i.

Plaintiff first argues that the force employed on Jack Marden by the Officer Defendants constitutes excessive force under the Fourth and Fourteenth Amendments of the United States Constitution.  Defendants contend that the force they employed was not in violation of any clearly established constitutional right.  A pretrial detainee alleging excessive force bears the burden of showing that "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). Objective reasonableness "turns on the facts and circumstances of each particular case." *Id*.  Relevant factors include the officer's knowledge at the time of the incident; the state's legitimate interest in managing the facility at which the individual is detained; "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id*.

In addition to asserting violations of the Fourth and Fourteenth Amendments, Plaintiff asserts in her complaint that the Officer Defendants' conduct constituted cruel and unusual punishment under the Eighth Amendment. However, because Marden was a pretrial detainee and not a convicted prisoner, the Eighth Amendment is inapplicable. "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally

associated with criminal prosecutions. … Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Ingraham v. Wright*, 430 U.S. 651, 671-72 n. 40, 97 (1977). *See also Kingsley,* 135 S.Ct. at 2475 ("pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'") (citing *Ingraham,*430 U.S. at n. 40, 97). Plaintiff implicitly acknowledges this in her response brief, recognizing that *Kinglsey* supplies the correct standard for determining whether excessive force was applied. *See* Pl. Resp. Summ J. I p. 12., ECF No. 64.   Summary judgment will therefore be entered as to Plaintiff's Eighth Amendment claims.

### a.

Excessive force claims are analyzed temporal segment by temporal segment. *See Claybrook v. Birchwell*, 274 F.3d 1098, 1104 (6th Cir. 2001). Plaintiff first asserts that Lieutenant Derocher employed excessive force by hitting Jack Marden in the head while pinning him down with his knees after the initial takedown. *See* Compl. 12-13, ¶¶ 2(a) & (f).   In support of her argument that Marden's right's in this regard were clearly established, Plaintiff cites the cases of *Phelps v. Cory*, 286 F.3d 295 (6th Cir. 2002), *Jennings v. Fuller*, 659 Fed. App'x 867 (6th Cir. 2016), and *Neague v. Cynkar*, 258 F.3d 504 (6th Cir. 2001).

The latter case, *Neague*, is largely irrelevant to this case.  While the case holds that the right to be free from excessive force is a clearly established right, the issue in that case was whether the handcuffing of a student incident to a lawful arrest could give rise to an excessive force claim where the handcuffing did not result in any physical injury. *See Neague*, 258 F.3d at 508.  The Sixth Circuit held that such a claim was insufficient as a matter of law. *Id.* The case therefore has little bearing on the contours of the rights at issue in the present case.

The facts of *Phelps* are more relevant. In that case, an officer requested that a handcuffed recent arrestee take off his shoes and socks for booking purposes. *See Phelps*, 286 F.3d at 297. While the arrestee attempted to comply his foot came close to an officer's face, and the officer grabbed the foot and pushed it away. *Id.* However, a different officer witnessed the exchange and believed that the arrestee was attempting to kick the other officer. *Id.* He therefore tackled the handcuffed arrestee, hit him in the face twice, and banged his head into the floor at least three times. *Id.* Importantly, there was no evidence that the arrestee posed a threat to anybody at the time of the incident. *Id.* Agreeing with the District Court that the Fourth Amendment's reasonableness standard applied, the Sixth Circuit found that the arrestee's Constitutional rights had been violated because "there was simply no governmental interest in continuing to beat [the plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was." *Id.* at 301. Determining that the use of gratuitous force against a helpless and incapacitated suspect during an arrest was clearly established as unconstitutional, the Sixth Circuit agreed with the district court that the case presented a triable issue of fact. *Id.*

This case is distinguishable from *Phelps* in a number of key respects. First, Marden was not handcuffed at the time of the incident. Second, Marden was actively, violently resisting officers who were attempting to extricate him from his cell. Although he was pinned to the ground, he was not fully neutralized, as evidenced by the fact that he was able to grab Derocher's testicles.

*Jennings* also presents facts that are similar to the present case. There, complaints by a former roommate led to a search for the plaintiff, who was found operating a vehicle while over the legal limit. *Jennings*, 659 Fed. App'x at 869. The plaintiff was taken to the booking room at the county jail, where he sat peacefully on a bench. *Id.* A large officer eventually entered the

room and ordered the plaintiff to stand and place his hands against the wall so that he could be patted down. *Id.*  When the officer patted down the plaintiff's crotch area, the plaintiff briefly and non-aggressively lowered his arm, to which the officer responded by slamming the plaintiff into the wall. Apparently in response to the slam, the plaintiff turned his head to the right, but kept his hands on the wall. *Id.*  Apparently in response to the movement, the officer and a colleague forcibly tackled the plaintiff onto the metal bench and then onto the floor.  *Id.*  The plaintiff cried out that he had emphysema and could not breathe, and began to struggle.  *Id.* at 870.  This, in turn, resulted in numerous other officers entering the room, holding the plaintiff down, and pepper spraying him in the face. *Id.*  Over the following nine minutes the plaintiff continued to struggle against officers who kneed his neck area, covered his mouth, placed a spit hood over his head, unsuccessfully attempted to move him to a restraint chair, and tazered him in the lower back.  *Id.*  The officers eventually secured the plaintiff with straps, face down, on a restraint bed, where they left him unattended for around three hours. *Id.*  During that time the officers did not wipe the pepper spray off of the plaintiff or remove his spit hood.  *Id.*  The plaintiff testified that he struggled to breathe, and eventually had to chew a hole in the hood. *Id.*

In finding that the facts alleged by the plaintiff rose to the level of a clearly established constitutional violation, the Sixth Circuit noted that the initial takedown was a gross overreaction.  *Id.*  However, the Sixth Circuit expressly noted that takedowns are appropriate in many circumstances, depending upon whether there is "some real form of resistance or danger." *Id.* And while the Sixth Circuit found the three hour restraint while wearing the blood-soaked spit hood unreasonable, the Sixth Circuit found that the actions that took place between the takedown and restraint were not objectively unreasonable:

> [W]hatever had led up to the takedown, the officers were faced with a suspect who was actively resisting, and they had to do something about it. The decision to

> restrain Jennings at that point was not constitutionally impermissible, and it is quite true that pepper spray, Tasers, arm bars, restraint devices, spit hoods, etc. all have their legitimate place. … Thus, the fact that the initial takedown was clearly unconstitutional does not mean that all the officers' subsequent actions are ipso facto not protected by qualified immunity.

*Id*. at 871.  In this way, *Jennings* bolsters Defendants' case for qualified immunity.  At the time of Marden's initial takedown he was actively resisting, and Derocher only struck Marden in the head after he grabbed his testicles.  After resolving that issue, the videos show that Derocher applied only the force that was necessary to continue restraining Marden.

The cases cited by Plaintiff affirm that officers may use reasonable force in response to a detainee's resistance. Moreover, in a recent unpublished case, the Sixth Circuit reaffirmed that qualified immunity shields officers that employ reasonable force in response to a reasonable belief that a detainee is behaving in a threatening manner.  *See Scott v. Kent Cty.*, --- Fed. App'x ---, 2017 WL 655773, at *4 (6th Cir. Feb. 17, 2017).  In that case, county jail employees attempted to move the plaintiff pretrial-detainee to a new cell after disruptive behavior.  The plaintiff initially refused to leave the cell, continuing to complain, yell and threaten other inmates. The plaintiff eventually left the cell without handcuffs and with clenched fists.  *Id*. at *2.  A deputy told the plaintiff to relax and release his fists, to which the plaintiff responded by stepping towards the deputy. *Id*.  The deputy, perceiving a threat, responded by reaching around the plaintiff's neck and taking him to the ground.  *Id*.  On appeal, the Sixth Circuit affirmed the district court's grant of summary judgment to the deputy on the basis of qualified immunity. *Id*. at **4-5. The Sixth Circuit reasoned that the plaintiff had not identified any clearly established law that would have placed the deputy on notice that the takedown was unconstitutional excessive force. *Id*.

*Scott* involved a plaintiff that had not actually employed any active physical resistance. In the present case, Marden had been actively resisting for over a half hour, and continued to actively resist the officers leading up to and during the course of the takedown. Plaintiff has identified no clearly established law that would have placed Derocher on notice that striking Marden in the head after Marden grabbed his testicles was unconstitutional. Derocher is therefore shielded by qualified immunity for striking Marden in the head.

**b.**

Plaintiff next alleges that Lieutenant Derocher used excessive force on Jack Marden by placing a spit hood over his head. *See* Compl. 13, ¶¶ 2(e) & (f).  Plaintiff has not cited any clearly established law or precedent holding that the use of a spit hood is per se excessive force. Instead, as noted above, the very case cited by Plaintiff confirms that spit hoods have their "legitimate place."  *Jennings*, 659 Fed. App'x at 871. Plaintiff therefore has not demonstrated that it violated any clearly established precedent for Derocher to place a spit-hood on Marden's head, particularly where Marden was actively resisting the officers and had already used bodily fluids as weapons. The Officer Defendants are therefore entitled to qualified immunity on this claim.

**c.**

Plaintiff alleges that the Deputy Defendants violated Plaintiff's constitutional rights by participating in and failing to intervene to prevent Derocher's alleged use of excessive force.  *See* Compl. 13-14, ¶¶ 2(g)-(j).  However, because Derocher's use of force was not in violation of any clearly established Constitutional right, the Deputies did not violate any clearly established Constitutional right by failing to intervene. They are therefore entitled to qualified immunity.

Summary judgment will thus be granted in the Officer Defendants' favor as to Plaintiff's excessive force claims.

## ii.

Plaintiff next alleges that the Officer Defendants violated Jack Marden's constitutional rights through deliberate indifference to his serious medical conditions. The Eighth Amendment prohibition against cruel and unusual punishment includes a prohibition against deliberate indifference to a prisoner's serious medical needs, meaning the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). (internal quotations and citation and omitted). This standard has been applied to pre-trial detainees such as Marden under the Due Process Clause of the Fourteenth Amendment. *See Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010). To demonstrate a claim of deliberate indifference, a plaintiff must meet an objective component and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). First, a plaintiff must demonstrate an objectively "sufficiently serious" medical need. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Farmer*, 511 U.S. at 834). Second, a plaintiff must show that the prison official had a subjectively "sufficiently culpable state of mind." *Id.* (quoting *Farmer*, 511 U.S. at 834).

The second requirement requires a Plaintiff to show more than "mere negligence." *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001). Instead, an official is deliberately indifferent if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. But an official is not free to ignore obvious dangers to inmates and may be liable even if he or she does not know the exact nature of the harm that may befall a particular inmate. *Id.* at 843–

44.  Where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004).

Plaintiff alleges that, by placing a spit hood over Marden's face, the Officer Defendants were deliberately indifferent to Marden's existing medical conditions, including his coronary artery disease and myocardial infarction, and his inability to breathe. *See* Compl. p. 14 ¶¶ 2(l)-(n).  This is not a case where Defendants failed or refused to provide Marden with medical attention.  It is also an unusual case, in that the series of events leading to Marden's medical emergency arose in part out of the jail officials' attempts to obtain medical care for Marden. After Marden began behaving erratically, Defendants developed a plan to extricate him from his cell in order to transport him to the hospital for medical care.  During the course of the attempted extraction, medical staff supplied Marden with a shot of Haldol. When Marden began audibly struggling to breathe during the struggle, Defendant Derocher directed a staff member to immediately call 911. He also repeatedly advised Marden to relax.  Derocher directed that Marden be moved out from under the sink, that the Deputy Defendants avoid placing pressure on his chest, and ultimately directed that he be placed in a chair – all in an attempt to improve Marden's breathing. As soon as a nurse recommended removing the spit hood, Defendants did so.  When Marden lost consciousness, Defendants immediately removed Marden from the restraint chair and began performing CPR until emergency medical personnel arrived on the scene.

In assessing the facts, this Court must take into account the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of

hindsight." *Kingsley*, 135 S.Ct. at 2473.  At the time of the incident, the Officer Defendants observed that Marden was struggling to breathe and knew that Marden required urgent medical treatment.   However, Plaintiff has presented no evidence that Defendants knew that the use of a spit hood would exasperate Marden's medical conditions.    Plaintiff points to Deputy Kryzanowicz's deposition testimony where he states that he did not take the spit hood off Jack Marden "[b]ecause everybody that the spit mask is used on says they cannot breathe."  *See* Kryzanowicz Dep. p. 34, ECF No. 64-38. But the thrust of Deputy Kryzanowicz's testimony is not that the spit hood causes people to struggle breathing, but that inmates disingenuously claim they cannot breathe in an attempt to secure removal of the spit hood. Deputy Kryzanowicz further testified that, in response to Marden's complaints that he could not breathe, Kryzanowicz lessened the pressure on Marden's upper extremities. *Id.*  Deputy Kryzanowicz's testimony thus further confirms that Defendants took active steps to provide Marden with medical assistance. Plaintiff also has not cited any precedent establishing that the use of a spit hood is a *per se* obvious danger or unreasonable risk. *Farmer*, 511 U.S. at 837, 844.  Therefore, even assuming that Marden's medical conditions were sufficiently serious to give rise to the potential for liability, Plaintiff has not established that Defendants' use of the spit hood violated any clearly established constitutional right. Summary judgment will therefore be entered in favor of the Officer Defendants as to Plaintiff's deliberate indifference claim on the basis of qualified immunity.

### iii.

In her final § 1983 allegation against the Officer Defendants, Plaintiff alleges that the Officer Defendants violated Jack Marden's constitutional rights by failing to follow the jail's guidelines and procedures regarding CERT operations.   Specifically, Plaintiff argues that

Defendant Derocher improperly entered the cell and restrained Marden with the CERT team without donning proper CERT attire. *See* Compl. p. 12-14 ¶¶ 2(a), (c) & (d).[2]

As explained by the Supreme Court, officials "do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer*, 468 U.S. 183, 194 (1984). In a § 1983 case, "the issue is whether [the officers] violated the Constitution, not whether [they] should be disciplined by the local police force." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). "To hold that cities with strict policies commit more constitutional violations than those with lax policies would be an unwarranted extension of the law, as well as a violation of common sense." *Id.* Here, Plaintiff has not shown that Defendant Derocher's failure to don CERT attire violated any state or federal rule, much less any constitutional right. Her claims in this regard are therefore without merit, and insufficient to deprive the Officer Defendants of qualified immunity as to Plaintiff's § 1983 claims.

### iv.

In addition to moving to dismiss Plaintiff's § 1983 claims, the Officer Defendants move to dismiss Plaintiff's state law assault and battery claims on the basis of qualified immunity. Defendants note that they enjoy qualified immunity for intentional torts under Michigan law if they were "acting in the course of [their] employment and at least reasonably believed that [they were] acting within the scope of [their] authority, that [their] actions were discretionary in nature, and that [they] acted in good faith." *Odom v. Wayne Cty.*, 482 Mich. 459, 481, 760 N.W.2d 217, 228-29 (2008). In her response, Plaintiff does not rebut the Officer Defendants' assault and battery arguments.

---

[2] To the extent Plaintiff attempts to allege violations of jail policies that were not properly set forth in her complaint, her arguments will be disregarded. See *Tucker*, 407 F.3d at 786. Moreover, such allegations are without merit for the reasons set forth in this section.

- 18 -

For the reasons stated above, because Defendants were performing discretionary actions within the course of their employment and within the scope of their authority, and because Plaintiff has not demonstrated that they acted with malicious intent, Defendants enjoy qualified immunity with regard to Plaintiff's assault and battery claims.  Summary judgment will therefore be entered as to Plaintiff's state law claims.

**B.**

By a separate motion, the Midland County Defendants also move for summary judgment as to Plaintiff's § 1983 claims. *See* Mot. Summ. J. I, ECF No. 49.  The claims against Defendant Harnois and Defendant Midland County will be addressed in turn.

**i.**

As to Defendant Harnois, Plaintiff alleges that he is liable in his personal capacity for the Officer Defendants' actions due to his roles as the supervising officer and jail administrator. Specifically, Plaintiff alleges that Captain Harnois is liable for failing to halt the attempt to remove Marden from the cell and to prevent the improperly attired Derocher from taking part in the operation. *See* Compl. p. 13 ¶¶ 2(b) & (k). Plaintiff also alleges that Captain Harnois is liable for participating and failing to intervene in allegedly unconstitutional excessive force and deliberate indifference to Marden's severe medical needs. *Id.* at ¶ 2 (g)-(i) & (l)-(n).

In moving for summary judgment, Defendants argue that Defendant Harnois cannot be liable for an omission or failure to act under § 1983, that Defendant Harnois's conduct was reasonable, and that his actions did not violate any clearly established constitutional right. "Supervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) (citing *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (1989)). Rather, the supervisors must have actively

engaged in unconstitutional behavior. *Id*. Captain Harnois therefore is not liable for any ommissions.

Moreover, for the same reasons that Plaintiff has not demonstrated that the Deputy Defendants' actions violated any clearly established constitutional right, Plaintiff has not demonstrated that Captain Harnois's actions violated any clearly established constitutional right. Because Plaintiff has not identified any precedent establishing that Defendant Harnois's actions were objectively unreasonable, Defendant Harnois is entitled to summary judgment on the basis of qualified immunity.

**ii.**

Plaintiff alleges that Defendant Midland County is liable for the actions of the individual defendants because it "authorized, tolerated, ratified and permitted and/or acquiesced in the creation of policies, practices and customs including inadequate training especially when making decisions on the use of force toward individuals incarcerated in the Midland County Jail…." *See* Compl. pp. 14-15. In *Monell v. Department of Social Services of New York*, the Supreme Court held that municipalities are "persons" subject to suit under 42 U.S.C.A. § 1983. *Monell*, 436 U.S. at 700-01. Such a claim may only be brought when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694. The Sixth Circuit has instructed that, to satisfy the requirements of *Monell*, a plaintiff "must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993) (internal citations and quotations omitted).

A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694**.**

**a.**

In her complaint Plaintiff alleges a single theory of liability against Defendant Midland County: that Midland County was responsible for the individual Defendant's unconstitutional acts because it provided inadequate training on the use of force. *See* Compl. pp. 14-15 ¶ 2(o). Plaintiff's complaint does not identify any specific policy or specific allegations regarding the purported insufficient training. In their motion for summary judgment, the Midland County Defendants argue that Plaintiff's *Monell* claim should be dismissed under Rule 12(c) for failing to meet the essential notice pleading requirements.  In the alternative, Defendants argue that Midland County had adequate training programs.

The Supreme Court has held that a city can be liable under § 1983 for inadequate training of its employees. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).  As a matter of law, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality – a 'policy' as defined by our prior cases – can a city be liable for such a failure under § 1983." *Id*. at 388-89.  The Court further instructed that liability may arise in cases where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the

policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id*. at 390. Distilling this precedent, the Sixth Circuit has instructed that a plaintiff must prove three distinct facts to proceed on a § 1983 claim based on inadequate training: (1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the city's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury. *See Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013).

In her response to Defendants' motion for summary judgment, Plaintiff argues that Midland County did not adequately train the individual Defendants on the use of spit hoods, which caused Jack Marden's injuries and death. Even if Plaintiff could show inadequate training, Plaintiff cannot demonstrate that the inadequate training was the product of Defendant Midland County's deliberate indifference to an obvious danger of constitutional violations. Again, Plaintiff has cited no law or precedent providing guidance on the use of spit hoods that would have placed Midland County on notice of any potential risk. Despite having a full and fair opportunity for discovery, Plaintiff has not presented any evidence that Midland County was otherwise aware of any particular risk of harm arising from the use of spit hoods. Therefore, as a matter of law, Plaintiff has not met the high bar of demonstrating deliberate indifference.

**b.**

In her response to Defendants' motion for summary judgment, Plaintiff argues for the first time that Defendant Midland County is liable for the individual Defendants' actions because Captain Harnois—the jail administrator—is vested with final policymaking authority for the municipality with regard to CERT operations. *See Miller*, 408 F.3d at 813. At no point in Plaintiff's complaint did she allege that Captain Harnois was a policymaking official, and she never attempted to amend her complaint so as to place Defendant Midland County on notice that

she was pursuing such a theory of liability.  Plaintiff may not introduce a claim for the first time in a response to a motion for summary judgment.  *See Tucker v. Union of Needletrades, Indus. & Textile Employees,* 407 F.3d 784, 786 (6th Cir. 2005).  In the alternative, in her response to the Midland County Defendants' motion for summary judgment Plaintiff requests permission to amend her complaint.  This Court does not entertain requests for affirmative relief within responses or replies.  *See* E.D. Mich. Electronic Filing Policies and Procedures R. 5(f).

Furthermore, Plaintiff's proposed claims regarding policymaking officials would be without merit.  In *Pembaur*, the Supreme Court explained that the "official policy" requirement of *Monell* was intended to distinguish acts of the municipality from acts of the municipality's employees. *Id.* at 1297-99.  "Officials can derive their authority to make final policy from customs or legislative enactments, or such authority can be delegated to them by other officials who have final policymaking authority." *Id.*  The question of whether a government official is vested with final policymaking authority is a question of state law.  *Pembaur*, 475 U.S. at 483. It is the court's task to identify the officials or governmental bodies which speak with final policymaking authority for the local government in a particular area or on a particular issue. *McMillian v. Monroe County*, 520 U.S. 781, 784–85, (1997).  In matters pertaining to the conditions of the jail, the sheriff is the policymaker for the county.  *See* MICH. COMP. LAWS § 51.75 (sheriff has the "charge and custody" of the jails in his county); *See* MICH. COMP. LAWS § 51.281 (sheriff prescribes rules and regulations for conduct of prisoners); *Kroes v. Smith*, 540 F.Supp. 1295, 1298 (E.D. Mich. 1982) (the sheriff of "a given county is the only official with direct control over the duties, responsibilities, and methods of operation of deputy sheriffs" and thus, the sheriff "establishes the policies and customs described in *Monell*"). Plaintiff argues that the Midland County Sheriff Policies and Procedures delegates the responsibility of establishing

emergency response team procedures and guidelines to the jail administrator. *See* CERT Policies and Procedures ("CERT P&P"), ECF No. 65-21. *See also Pembauer*, 475 U.S. at 483 ("[a]uthority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possess such authority…."). Indeed, Jail Policy and Procedure 3.112 gives the "Jail Manager" power to amend or repeal CERT. policies and procedures. *See* CERT. P&P 3.112X.[3]

Plaintiff argues that Captain Harnois's actions were the moving force behind the constitutional violations experienced by Jack Marden because he ordered the officers donning CERT gear to extract Marden from his cell without having reviewed Marden's medical history. Plaintiff has not argued that Midland County's CERT policies and procedures are facially invalid. Therefore, in raising her as applied challenge based upon an isolated incident, Plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (quoting *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 407 (1997)). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410.

Plaintiff has not demonstrated that Harnois's discretionary decision to utilize a CERT operation was unconstitutional. As explained by the Supreme Court, courts must account for the "legitimate interests that stem from the government's need to manage the facility in which the

---

[3] Plaintiff's corresponding argument that Lieutenant Derocher was a policymaking official is without merit. "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials. *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). While Derocher may have had discretion in acting as the team leader for CERT operations, Plaintiff has presented no evidence that he had the authority to establish jail policy or that his actions were unreviewable by his superiors.

- 24 -

individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." Kingsley, 135 S. Ct. at 2473, (quoting *Bell*, 441 U.S. at 540) (alterations omitted). County jails therefore have broad discretion in employing procedures designed to address erratic and potentially dangerous inmates. Even if failing to review Marden's medical history constitutes negligence, Plaintiff has not demonstrated that Captain Harnois's conduct rose to the level of "deliberate indifference."  That Marden would suffer a heart attack while Defendants attempted to relocate him to obtain urgent medical care was neither known nor obvious.  Again, this Court must take into account the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 135 S.Ct. at 2473. Plaintiff therefore has not demonstrated that Defendant Harnois was deliberately indifferent in overseeing the CERT operation.

### c.

Plaintiff also argues for the first time in her response that Defendant Midland County is liable for having a policy of failing to supervise Deputy Speich, who had previously been disciplined for a single incident in which he employed excessive force.  As with Plaintiff's previous *Monell* argument, Plaintiff did not raise this claim in her complaint, and did not attempt to amend her complaint.  She therefore waived her right to raise such an argument in a response to a motion for summary judgment.  *See Tucker*, 407 F.3d at 786. Even so, Plaintiff's argument is without merit. Because Plaintiff has not shown that Deputy Speich committed any constitutional violation during the incident in question, Plaintiff cannot show that any alleged policy of failing to supervise Speich was the driving force behind Marden's injuries.

### IV.

In two additional motions pending before the Court, Defendants move to challenge the revised opinion of their own expert, Dr. Verani, and move to strike rebuttal experts disclosed by Plaintiff after the deadline. *See* ECF Nos. 44, 63.   In his revised opinion Dr. Verani posits that the use of a spit hood limited Marden's ability to breathe and contributed to his death. *See* Verani Dep. 20-24, ECF No. 44-2.  The opinions of the two rebuttal experts, Doctor Jeffrey Breall, M.D., Ph.D., and Doctor William Cardasis, M.D., concern the possible causes of Marden's erratic behavior and Marden's ultimate cause of death.

As noted above, Plaintiff's claims focus solely on Defendants' alleged misuse of force in responding to Jack Marden's behavior on February 11, 2015, and therefore any actions of the jail medical providers during the time between Marden's intake and the events that took place on February 11, 2015 are irrelevant based on the framing of Plaintiff's complaint. *See* ECF No. 33. For this reason, and because this case is being decided on the basis of qualified immunity and deliberate indifference, there is no need to address the admissibility of these expert opinions. Defendant's motions to strike will therefore be denied as moot.

## V.

Accordingly, it **ORDERED** that Defendants' motions for summary judgment, ECF Nos. 49, 51, are **GRANTED**.

It is further **ORDERED** that Plaintiff's complaint, ECF No. 1, is **DISMISSED with prejudice.**

It is further **ORDERED** that Defendants' motion to challenge Dr. Verani's new opinion testimony, ECF No. 44, and Defendants' to strike newly added expert witnesses, ECF No. 63, are **DENIED as moot.**

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 24, 2017

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on March 24, 2017.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager